Ms. Arfa is here in person, and Mr. Beasley, appearing remotely, with a lovely background of our Chambers Courthouse. All right. So, Ms. Arfa, when you're ready, please go ahead. Yes. Good morning, and may it please the Court, it is nice to be here in person after such a long time. I was thinking how to describe this case, using words that I'd have to say, horrendous, outrageous, and illegal, and unconstitutional conduct that the prosecution engaged in. And just to go over a little bit of the timeline, in 1998, the incident happened, and they really had nothing on Mr. Begaren. Zero. And so the case, it went cold for 12 years, and they finally trace the car to Mr. Sandoval. They don't really have anything still on Mr. Begaren, and Sandoval implicates Duran, who eventually implicates Mr. Begaren. But the most outrageous conduct was to have Wyatt transfer Mr. Duran from state prison to the Orange County Jail, where he... Counsel, may I just ask you something about the timeline here? Yes. Because you said they had nothing, but didn't law enforcement have Mr. Begaren under surveillance for some time immediately after, or shortly after, the killing? Yes, but they... And when did the incident occur involving the drop of an item, specifically the phone bill, into a dumpster? How soon after the event did that occur? That was while he was under surveillance. Yes. Well, the incident occurred on January 17, 1998, and they got the stuff out of the dumpster on February 25, 1998. So that's all they had at that time. They had no... But you said, you really said they had nothing, and... What did they have? But they were surveillance. Okay, they have surveillance, yes. And they had that? Yes, but they have nothing tying him. The trash that they got out of the dumpster did not link Mr. Begaren to any crime. They just kept it. It was just there, and it was cold for... Pretty bad investigative work. Pardon me? Rather bad investigative work. Yes, well... So, Ms. Offred, turning to the use of Mr. Duran's statements, you make a claim that Mr. Duran's statements was illegally obtained. It was unconstitutional. I hear an echo, so... Let's see. Can I move this a little closer, or I move closer to it? Is that better? Yes. Okay. So, with Mr. Duran's statement and the use of the informant, Mr. Cuevas, the California Supreme Court decided that was not... that that was not a violation, and we're determining whether they have reached an unreasonable application of federal law. Okay. So, it seems that you're arguing that Mr. Duran's constitutional rights were violated by the manner in which that statement was obtained? Well, his rights were violated, but what they did was use the information that they got from an informant illegally to link Mr. Begaren to the crime. All right. So, you're sort of arguing a fruit of the poisonous tree. In other words, there would be no basis to assert a constitutional violation on behalf of Mr. Duran, and Mr. Duran's statement wasn't played at the trials, I understand it. And I don't see an argument that his statement was coerced. Well... So, is your argument that what they were able to obtain from that statement just tainted? Yes. Well, Mr. Duran's statement was definitely coerced. I mean, he was... But he's not a party to this lawsuit. I mean, if his rights were violated, why is that relevant with respect to Mr. Bergeron? Well, no, because that was Brady information. Mr. Begaren's rights were violated because they didn't turn it over. In other words, the only reason that they got Mr. Begaren was from Mr. Duran. Okay. So, let's go with that and just assume that that's correct, that there was a violation, that the information was prejudicial, and that the defense could have used it to impeach the detective Wyatt. Is it material? Would it have made a difference? Why is it material? Yes. Because the whole theory of the defense case was that the police conspired against Mr. Begaren. But Mr. Cuevas got Mr. Duran to tell the truth. That's what he asked him to do, isn't it? Well... Just tell me. Just come clean. Well, tell him my truth. He threatened to kill him. I mean, he did this under duress. He wanted to hear what he wanted to hear. He was feeding him information. So, Duran implicated himself. And Mr. Begaren. But he did not mention Mr. Begaren by name. I read the transcripts. The Italian guy, Tony, or something. He didn't say Tony. He talked about Kreacher and the Italian, but he didn't implicate Mr. Begaren by name. So it seems, you know, an issue is that I don't think you can assert a constitutional violation on behalf of Mr. Duran. And he testified, and you haven't asserted that his testimony at the trial was coerced. His testimony at trial was consistent with what he said, and it was also consistent with Mr. Sandoval's testimony. So what you have, I believe, is a claim that it impeded the defense's ability to impeach Wyatt. Yes. Brady. That's right. So that was the reason why this was important information, a Brady violation. You wanted to impeach Wyatt. Yes. Okay. Yes. That was very important because the prosecutor argued his whole theory was Duran told the truth. He was truthful. This is coming from the prosecutor in closing argument. Okay? Well, it doesn't seem that that's significant in impeaching Wyatt because there's nothing that suggests that Duran wasn't telling the truth. You would want to impeach Wyatt and say he wasn't telling the truth. Well, he said Duran was truthful. When he said that Duran came forward on his own, right? That's different than the manner in which this interrogation occurred. Pardon me? Wyatt said that Duran came forward on his own. Wasn't that true? I thought that's what he said, and that that was the crux of the impeachment of Wyatt. No. Well, no. He also said that Duran didn't talk to anybody. Right. He never said that he put Mr. Duran in with a thug, a shot caller, a well-known informant, and needed to get information from him. And that's how Mr. Begarin's name got into it, because the next day was when the police officer, Wyatt, interviewed Mr. Duran. I have in my notes that he mentions Tony. He mentioned Tony to Duran, I mean to Mr. Wyatt, police officer Wyatt, when they had their discussion. He mentions Tony. But that's different from what he said to Cuevas. Right, right. Except that I think Duran had enough. I mean, I think that Cuevas, Wyatt, they had enough to get Mr. Begarin at that point. Is there any direct evidence showing that Duran was somehow forced to implicate Begarin? I understand your argument that Mr. Cuevas threatened him, and therefore he concocted the story. I understand that argument, but that seems a little bit speculative. Is there anything that suggests that Mr. Duran was forced to implicate Mr. Begarin specifically? Yeah, I picked out the excerpts and put them in my brief. I mean, he's telling him, you know, you couldn't have done this alone, and there's somebody else. But I understand your theory that he was being pressured, but anything specific to Mr. Begarin? Well, the Italian guy, that's what he was talking about. I mean, that's the way they talk. So that narrows it down to several million people. That's the way the gang members talk. They talk in kind of code. So to me, it's blatant. But in terms of Brady… But even the Italian guy, I mean, he could have concocted the story and said it was an Albanian guy, it was a Japanese guy, whatever it is. I mean, is there anything that directly links to that other than kind of speculation that, well, he was trying to save himself, so he mentioned somebody? Well, I believe under the conversation it was Mr. Cuevas who said the Italian guy, he's the one that brought it up about the Italian guy. He's the one that mentioned the Italian guy. He brought him up. And from then on, that was the spark that lit the entire case, and that was the entire link to Mr. Begarin. Because if the prosecution would have been honest, they would have said, look, we brought Mr. Duran back from state prison. We put him in a cell with a criminal informant who has a long history of shot calling, who's one of the major Mexican mafia people. And at that point, there was a discussion, and a lot of it we couldn't hear. A lot of it was intelligible. So the part we could hear was he implicated Mr. Begarin, and that's what they were looking for. And then the day after that, right after that, they had an interview. The arrangement was on May 22, 2012. That was when they brought in Mr. Cuevas. And then the next day, that's when Wyatt interviewed Mr. Duran, and then he gets Mr. Duran to say something about Tony. But that was the theory all along. I mean, they already had Mr. Begarin under arrest. Why did Cuevas even have to mention Tony? He didn't mention Tony, but why did he even have to talk about the Italian guy and things like that? And again, this is only the stuff that we were able to get after enhancing the video, the audio tape. That's all we could get. But the problem is, this is Brady material. It's clearly Brady material. It's clearly impeaching. It impeaches their star witnesses, which really were Duran and Sandoval and Wyatt. So what's the theory of ineffectiveness here with respect to that Brady material, that impeachment material? Well, they didn't turn it over until after trial, until after this big scandal broke. And then they had to turn it over. Otherwise, we probably wouldn't be here. But they had to turn it over, and in terms of the ineffective assistance, it's really appellate counsel. And unfortunately, he relied on a statement from—the prosecution wrote in a letter, kind of a watered-down thing. You know, we hadn't—somebody said this, and somebody said that. And then you have defense counsel saying it was not material. I mean, you know, I've been on the side of the defense for a long time, and you never get, let's say, the best facts. You have to work with what you have. And certainly it was an arguable issue, especially in light of this public scandal that was going on in Orange County. They reversed at least three major cases based on this kind of evidence, and that's what makes it so dangerous. Can I ask you to turn to a different issue? It's related. It's another Brady claim that you assert with respect to plea deals. Is there anything in the record that suggests that plea deals were completed before the trial? They were actually after the trial, but the way it works is they know they're going to get something. And they testified to that? Yeah. They all testified that they expected to get favorable treatment? Yes. So what more could you get through impeaching by the details of the clemency, the gift, whatever it is the prosecution gave them by way of sentence, that you didn't already get by way of the witness's testimony, I think both of them, Sandoval and Duran, that they expected to get some treatment, some special treatment, if you will, for having testified? Yeah. The jury already knew that. Right. There's a difference between saying I'm going to get, you know, I'm hoping, I'm not getting. I mean, I believe that the way this goes is I'm hoping I'm not going to get anything. I mean, I'm hoping. It's my hope that by me testifying. But you're impeaching the witness. You're not impeaching the state. So what difference does it make what the state gives them? Well, yes, but they hoped they would get something. That's what they said. But, I mean, you've got six years. I mean, the defense needs to show a motive for them to lie is to impeach them, and there's the motive right there. I'm expecting that I'm not going to get a sentence of life in prison and I'm going to get a favorable treatment. That's not enough. That really never worked. That's kind of a watered down. But you've said that the plea agreements didn't exist. They had not entered into plea agreements until after the trial. Right. So as Judge Smith asked, what more could the prosecution have given you to avoid a Brady violation? Well, that's in terms of the plea deal. That's afterwards. Okay. I think it's important for impeachment purposes. So they happened after the trial. It's a little late then. Are you suggesting that that is a basis for an ineffective assistance of counsel claim on appeal? I think it was. I think it was. I think the main—but in order to get there, I think we have to go back to the facts of how Mr. Beguerin was convicted and why he was convicted. And it was based on the testimony of the killers themselves, except for Espinoza. But Mr. Duran, he's the one that actually drove the car. And then you had Mr. Sandoval drove the car. You had Mr. Duran, who set up the whole thing. So— We're well aware of the facts, but we're now a minute, more than a minute over time. But I will—when the clock starts going up— I wanted to do some rebuttal. Well, I'll give you a couple minutes in rebuttal. You typically would need to reserve that time, but I'll let you have a couple minutes. Thank you. I wasn't watching. Thank you.  All right. Mr. Beasley. Good morning, Your Honors. Christopher Beasley, Deputy Attorney General, on behalf of the respondent in this case. I think that Judge Beatty has framed the issues really well in this case by starting out with what the standard is under Section 2254D. Was the California Supreme Court's rejection of these claims based on an unreasonable application of controlling federal law as determined by the United States Supreme Court? I agree with Ms. Arfa that there was indeed a discovery violation here, that the prosecutor should have turned over the jailhouse recording between Cuevas and Duran to the defense. Why? Because those were statements from a witness. They were statements that could conceivably be used for impeachment. But just because we have a discovery violation does not automatically mean we also have a Brady violation. And I think that the California Supreme Court got this right when they rejected the claim. There's no materiality here. Why? Because what Duran actually says in the jailhouse recording, as Judge Smith has pointed out, it was a demand for the truth. Yes, it was under pain of death, but it was nonetheless a demand for the truth. Tell me what happened. Tell me the truth. And so we get, then, this account from Duran that remains consistent at every stage from the first conversation with Cuevas to the interview with Wyatt and then to the trial testimony. Now, the argument is, like Judge Brady suggests, is this is fruit of the poisonous tree, that because he may have fabricated in that initial interview or conversation with Cuevas, then that tainted the rest of it. And that's why it could be conceivably used for impeachment. But then we look at what other evidence came in. Sandoval, who's not at all implicated in any of this, he testified consistently with what Duran testified to. He testified about the crime. He talked about how he was the driver, how there were three people involved, himself, Duran, and SBOs. If I may interrupt, was Mr. Duran the only person who directly implicated Mr. Bergeron, assuming the reference to Italian refers to Bergeron, who I believe is an Italian? But assuming that's the case, is Mr. Duran the only person who directly implicated Mr. Bergeron? Yes, and that implication by Duran is then corroborated by the phone bill. The fact that there's this phone call from Bergeron two or three days after the murder to that phone number that's Duran's. And so, yes, that's correct that Duran is the only one who actually brings in the tie directly. But then there's the corroborating evidence, the phone bill, the insurance policy, the fact that there was a $1 million insurance policy on the victim that Bergeron was a beneficiary of. And so those pieces of circumstantial evidence also helped to bolster the connection with Bergeron. But ultimately, that's what makes this not material and therefore not a violation of Brady. Because when you take the evidence from Sandoval together with the other corroborating evidence, the phone bill, the insurance policy, those things help then to establish, yeah, nothing here is fabricated. And so even though you didn't have this impeaching evidence, it wasn't material. It wouldn't have made a difference if you had had that impeaching evidence and presented it to the jury and said, hey, look, Duran has this motivation to lie because he was threatened in jail by Cuevas. If that had been presented to the jury, the jury would have thought, well, OK, that's interesting. But everything that Sandoval says supported it. And interestingly enough, the prosecutor in closing argument told the jury, look, Duran, you have every reason in the world to disbelieve and to distrust Duran. He's a criminal. He's a convicted criminal. He was willing to set this whole murder for hire up, and he was willing to do it. So you have to look, jurors. You have to look for corroborating evidence. So the prosecutor himself acknowledged that Duran, important as he was, had to be corroborated by independent evidence. And that's why there's no Brady violation here. That's why when the California Supreme Court rejected this claim, it was reasonable because there's no materiality. And further, I'd add that the California Supreme Court was not ignorant of the problems that were happening in the Orange County jail. By the time that this case came to the California Supreme Court on habeas, the Decry case had already been decided in the Court of Appeal. It was big news what had happened in Orange County. And the California appellate courts, as evident from the Decry case, jealously are trying to guard the rights of defendants, jealously are trying to ensure that prosecutors are upholding their ethical responsibilities and obligations, which is why in Decry the Court of Appeal went ahead and affirmed the order recusing the entire Orange County District Attorney's Office. As a prosecutor myself, I recognize that our obligation is to do justice, not to seek convictions at the cost of anything. Anything goes. Absolutely not. As a representative of the California Department of Justice, I'm saddened that this kind of conduct happened at the Orange County jail, at the Orange County District Attorney's Office. But when push comes to shove, this case is not Decry. This case is not Govey. This is not a case where we had a Messiah violation. This is not a case where we had hundreds of thousands of documents withheld. This is a case where we have no materiality. Yes, the material should have been disclosed under the discovery statutes in California. But even though they weren't disclosed, it made no difference. In terms of the plea deals, I agree with Judge Beatty. These were plea deals that happened after the fact. There were no plea deals. So as Judge Smith asked, what more was the prosecutor supposed to turn over? There was nothing more that the prosecutor could turn over because there were no plea deals. However, the defense was able to elicit from these witnesses that they hoped for a deal. They hoped to have favorable treatment. They hoped to be able to benefit from the fact that they were testifying. So the jury learned all about that hope and that that was a motivating factor for why they were testifying. And so the fact that then later, after the fact, actual plea deals came to pass, that doesn't matter. What needed to be presented to the jury was presented to the jury. And so the fact that the plea— Well, may I interrupt you for a moment? On that point, is there anything in the record that suggests that there were communications between the state and these witnesses conveying promises of leniency, even if they weren't formalized in a plea agreement? Yeah, what we do know, what we do have is that there was a communication from Wyatt to at least Duran, stating you can either be a witness or you can be a defendant in this case. Did that come in at trial? Yes, he testified to that at trial. And so the jury knew that. But that's all we know in terms of what we have in terms of communications between government actors and these witnesses. If there were such communications, even if plea agreements had not been formalized, would you agree that the state would have had an obligation to disclose that? Yes, I would agree with that, that those kinds of communications would be— those are statements by witnesses, and witness statements are discoverable, should be disclosed. And so, yeah, I think that that would have been something to disclose. And I think that it wouldn't have added more than what already was presented if those kinds of communications did happen. But like I say, we have no record or evidence that such communications did exist. All we have is the statements that we know Wyatt made to Duran, and then the hope that the witnesses themselves conveyed to the jury. Unless this court has further questions, I have nothing further to say. So I would submit with just the request that this court affirm the judgment of the district court denying habeas relief. All right, thank you. Ms. Zafra, we'll give you two minutes. The California Supreme Court, as I recall, did not issue a reasoned decision. It was just a summary denial. So this court has to look through the evidence. But also the fact that Wyatt would go through the process of bringing Duran down from state prison and putting him with Mr. Duran and then threatening him. I mean, this was a latent threat. I mean, he was going to be killed if he didn't say what was wanted. So your opposing counsel has conceded that this was a discovery violation. So I think what you need to focus on is how this was material. Yes, it was material because, look, they needed it. If they didn't have information from Duran, they had no case against Mr. Begarin. There was no case against him. That's why they needed it. So the guy gets up and says, okay, I hope that I'm going to get a deal and I hope that they're going to do this and they're going to do that. They were going to do it. They were. And I think that there was evidence there that they were promised leniency. It wasn't just that they hoped. That's just the standard thing that prosecutors say. I mean, I've been a prosecutor before. Is there any evidence that there were actual communications that were not disclosed? I think there was enough that we knew about because, look, if they had such a strong case, if they had Sandoval, they didn't have Duran. You're asking us to speculate. I mean, is there any evidence of these missing communications? Well, except that the attorney general is saying that they had a lot of corroborating evidence. They had the telephone call. They never had that until Duran got into the picture. They never had that. Okay, so they had an insurance policy. So, I mean, so what? Okay. They didn't have anything on Mr. Begarin. They only had information. The only person they really had was Sandoval. All right, so you're now over again. Yeah, I just wanted to say that this conduct was so egregious and so horrific and so unconstitutional in terms of Brady and the fact that other cases have been overturned based on this, the very use of this that I think it's so important to send a message that you can't engage in this kind of illegal conduct without consequences, okay? And that's, I think, what my main concern is that, you know, you can't just say, okay, well, it was illegal, but nobody got hurt. All right, we understand your argument. Thank you very much. Thank you. All right, thank you both for your arguments this morning. The case is taken under submission.
judges: UNKNOWN, BADE, LEE